VILLAGE ON THE HILL, INC. *vs.* MASSACHUSETTS
TURNPIKE AUTHORITY & another.

SAME *vs.* BUILDING COMMISSIONER OF BOSTON.

Suffolk.   October 8, 1964. — November 12, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Massachusetts Turnpike Authority.   Eminent Domain,* Purpose of taking,
Validity of taking, Massachusetts Turnpike Authority.   *Constitutional
Law,* Public purpose, Eminent domain.   *Way,* Incidental to Massachu-
setts Turnpike.   *Zoning,* Public authority.   *Mandamus.*

Where it appeared that part of land taken from a landowner by the
Massachusetts Turnpike Authority by eminent domain became, in the
circumstances, with other land of the Authority, an excess area which
the Authority contracted to sell to a private industrial concern dis-
placed from the former site of its plant by the turnpike and on which
the concern was permitted by the Authority to erect a new plant before
conveyance to the concern, and that part of the land taken was used
for relocation, over a reasonable route, of a way in order to furnish
necessary access to such excess area from public ways, there was, on the
facts, no merit in a contention that the taking was invalid on the
ground that, although purportedly made for the purposes of the turn-
pike, in reality it was made to benefit the concern.   [114–115]
Where the State Department of Public Works had approved a relocation
of a public way by the Massachusetts Turnpike Authority but not an
extension thereof for which the Authority made a taking of land by
eminent domain in the name of the municipality, the establishment of
the extension as a public way could be perfected either by obtaining
approval of it by the Department of Public Works as part of the re-
location of the existing public way or by municipal action to lay out
the extension, and the taking was not beyond the power of the Au-
thority under St. 1952, c. 354, § 7, as amended by St. 1958, c. 384.
[115–117]
Local zoning provisions were applicable to land of the Massachusetts
Turnpike Authority which had become an excess area no longer needed
in any way for the Authority's functions and which the Authority had
contracted to sell to a private concern, even though the conveyance to
the concern had not yet been made.   [118–119]
In a mandamus case to compel a municipal building commissioner to en-
force local zoning provisions as to residentially zoned land on which

an industrial building was erected, a denial of the writ on the erroneous ground that such land was not subject to the local zoning provisions was reversed by this court, but in the circumstances the case was remanded to the trial court for further proceedings, which might include a determination whether the zoning and other aspects of the situation had changed or were likely to change in the near future, and for exercise of discretion as to the time and terms of any relief then appearing to be appropriate.  [119–120]

BILL IN EQUITY filed in the Superior Court on April 15, 1963.

PETITION for a writ of mandamus filed in the Superior Court on May 10, 1963.

The cases were heard by *Brogna, J.*

*Joseph B. Abrams* (*Joseph Graglia & Robert T. Abrams* with him) for Village on the Hill, Inc.

*Lawrence J. Moore,* Assistant Corporation Counsel, for the Building Commissioner of Boston.

*John L. Murphy, Jr.* (*Arthur A. Karp* with him) for Massachusetts Turnpike Authority.

*Sumner H. Babcock* (*Francis S. Moulton, Jr.,* with him) for Rivett Lathe & Grinder, Inc.

CUTTER, J.   These two cases grow out of the authority's eminent domain taking of land of the plaintiff (Village) in the Brighton district of Boston in connection with extending the Massachusetts turnpike to Boston.   The first case, a bill primarily for declaratory relief, alleges that the takings were illegal and part of a plan by the authority and a defendant in the equity suit, Rivett Lathe & Grinder, Inc. (Rivett), to deprive Village of its property for the benefit of Rivett.   The bill also seeks injunctive relief concerning the relocation (on or near Village's property) of a private way known as Newton Street and the construction, in part upon land taken from Village, of a factory building designed for Rivett's use.   The second case is a petition by Village for a writ of mandamus to compel the building commissioner of Boston to enforce the Boston zoning law (St. 1924, c. 488, § 18) which at the time of the filing of the petition (May 10, 1963) placed in a general residence district part of the land upon which the factory building was being constructed.

The facts are stated, except as otherwise indicated, upon the basis of the trial judge's findings in these cases. In the equity case, Village has appealed from a final decree that the authority's taking of Village's land "was a taking for a public purpose and not for the private need of Rivett." In the mandamus case, Village has appealed from an order that the petition be denied.

### THE EQUITY SUIT.

Rivett owned a plant at a point somewhat east of the area with which the bill is concerned. In 1957, one Hunt, Rivett's president, learned from the authority's chairman that the Rivett plant would probably be taken for the turnpike extension. Hunt was advised to "take steps to relocate" the plant. In July, 1959, Hunt and his wife bought a parcel in Waltham and gave Rivett an option to purchase it at the price paid by the Hunts.

There was a delay for some time when plans for selling certain authority bonds were postponed, but in January or February, 1961, Hunt ascertained that the turnpike extension would go through his plant. In March, 1961, representatives of the authority told Hunt that there would be "extra land" in the Faneuil Dump area, near the Newton-Boston boundary, which might be suitable for Rivett's new plant. "This area consisted of land owned by the Boston & Albany Railroad which the . . . [a]uthority had a right to purchase." On July 16, 1962, Hunt received a plan from Rivett's engineers (Lockwood and Greene) indicating "a proposed plant within . . . the Faneuil Dump area previously owned by the . . . [r]ailroad."

At meetings in September, 1962, attended by Hunt and representatives of the authority, Rivett's damages for the taking of its old plant were determined and Rivett (subject to the approval of its directors) agreed to buy part of the dump area for $100,000 "if access and utilities were" available. Hunt, instead of moving to Waltham or elsewhere, "preferred to relocate . . . in the Brighton area" where most of Rivett's employees lived. Consultations with the mayor and the city's assessing commissioner resulted in as-

Village on the Hill, Inc. *v.* Massachusetts Turnpike Authority.

surances (apparently designed to retain Rivett's properties, business, and jobs in Boston) concerning 1963, 1964, and 1965 assessments on the land to be purchased and the building to be constructed by Rivett.

The exhibits show that the proposed turnpike extension in this dump area in general followed the then existing line of the Boston & Albany Railroad. This necessitated moving the railroad tracks to the south and away from the Charles River. There would be no access over the tracks to the proposed turnpike from the dump area. Although the record is not very clear on this point, various exhibits strongly indicate that there would have been no access (except over intervening private land) from any public way to so much of the former railroad dump land as was not needed for the relocated railroad or the turnpike, if the authority had not arranged some extension and relocation of private ways and "paper" streets to the south and east of the dump area.

The attached sketch plan shows the principal features of the Faneuil Dump area and its surroundings.[1] Apart from a strip at the northern edge of the plan, the land immediately east of the Newton-Boston boundary and north of the more southerly line marked "Former B. & A.R.R. Property Line" had been owned by the railroad prior to the turnpike construction. There seems to be no doubt that the authority owned, or had the right to acquire, the railroad land, within which the original Lockwood and Greene plan indicated most of Rivett's new plant could be built (see dotted lines on sketch plan showing approximate location). The authority's 1960 plans showed a projected extension of Newton Street (see fn. 1) "through the former [r]ailroad

---

[1] The sketch plan is a simplification of various exhibits. The portions of Newton Street, Bethune Street, Presentation Road, and Burton Street in the immediate neighborhood of the dump area were shown as private ways on 1960 Land Court plans of Village's land. The trial judge found (apparently, in part, on the basis of a relocation plan approved by the Department of Public Works) that "Newton Street was a public way . . . [coming from the east, only] to approximately the point where it joined with Charlesview Street. From this point . . . in a westerly direction . . . a private way called Newton Street . . . [led] to the [railroad] property . . . . This . . . was a paper street only and had never been developed."

property . . . westward into Newton'' (see the dotted lines marked ''originally planned Newton Street Extension''). In mid-September, 1962, Hunt was told by the authority's chairman ''that the proposed relocation of Newton Street would not continue as previously planned to the Newton [c]ity line but would stop somewhere in the Faneuil Dump area and that a reserve[d] . . . [area, marked on the sketch plan] would have to be retained for the future extension of this road into Newton.'' This change appears to have developed in the manner described in the margin.[2]

This 1962 change in the location of Newton Street to the route marked on the sketch plan, ''Relocated (1962) Newton Street Extension,'' made it ''impossible to locate the Rivett . . . plant wholly on former railroad land . . . . The relocation . . . deprived Rivett . . . of some 44,000 square feet of relatively level land,'' and changed the shape of the lot available for sale. As a consequence, the authority reduced the price to Rivett from $100,000 to $80,000.

A purchase and sale agreement, dated January 17, 1963, described the revised area as including land ''between the southerly border of the former Boston & Albany land and the northerly side of relocated Newton Street.'' See the sketch plan. The agreement, among other things, provided that Rivett ''at its own risk and expense, may enter upon the property for . . . construction of its new plant as soon

---

[2] Under date of June 11, 1962, engineers acting for the authority instructed another engineering firm, DeLeuw, Cather & Co., to make studies and submit ''recommendations as to a revised location'' of Newton Street. The DeLeuw firm was told that ''the portion of Newton Street in Newton will not be constructed,'' and that it had been suggested ''in order to avoid the possibility of affecting . . . [a] nursing home'' (see lower right part of sketch plan) that Newton Street be constructed further to the north than had previously been proposed. On July 26, 1962, this firm brought forward a ''plan in which the Newton Street extension was made to swing in a southerly direction,'' which would necessitate taking some of Village's land. The evidence (including a contour plan) indicates (1) that the elevation of the proposed relocation of Newton Street at its junction with Charlesview Street was about eighty-five feet, and (2) that near where the 1960 planned extension of Newton Street approached the former railroad land the elevation was around thirty-five to forty feet. The distance between the railroad land and the intersection of Newton Street and Charlesview Street (scaled from a map in evidence) is about 480 feet. The 1960 route would thus have dropped about forty-five to fifty feet in 500 feet, a ten percent grade or a little less. The 1962 route made approximately the same descent in 1,040 feet, an average grade of about five percent.

as the [a]uthority obtains title to . . . premises . . . not then owned by'' it.

On October 18, 1962, the authority took some of Village's land. This land lay (see sketch plan)[3] largely south and east of the former railroad land. The order recited, among other things, that the taking was for the turnpike extension and ''for the purpose of relocating and constructing a portion of a private way (Newton Street).'' Village's land was taken (as the evidence shows, in January, 1963) for ''the [c]ity of Boston and the [c]ity approved the location of Newton Street extended and the plans for the utilities therein.'' The Department of Public Works ''approved the relocation of that part of old Newton St[reet] which was a public way but has never been requested to approve the relocation . . . of that part . . . which was a private way.''

Prior to the date of the judge's findings (September 4, 1963) there had been no conveyance from the authority to Rivett. Legal title to the premises, including the building being constructed there by Rivett, remained in the authority. The judge found, however, that it was ''the present intention of the parties to . . . fulfill the terms of the purchase and sale agreement.'' Rivett started site clearing on November 14, 1962, and at the time of the trial (in late June, 1963) construction of the building was nearly completed.[4]

With respect to the relocation of Newton Street, west of Charlesview Street, the judge made findings. ''When Newton Street was relocated farther north[5] to avoid the nursing

---

[3] All of the area taken except the area marked ''2'' would have been taken under the 1960 plan. The areas marked ''1,'' ''1A,'' and ''3'' would apparently have been taken under the 1960 plan, but were not taken in 1962.

[4] Rivett had agreed that it would be out of its old plant within six months after construction started on the new plant. Because of the need for speed, the use of prefabricated materials was investigated and Rivett signed a construction contract on January 2, 1963. Rivett's contractor applied for a building permit in Rivett's name, because ''not aware of the legal niceties of the situation in which title had not yet passed to Rivett.''

[5] The evidence does not show that, near the nursing home east of Charlesview Street, Newton Street (as distinguished from the taking line, see sketch plan) was in 1962 moved north from its 1960 planned location. There was evidence,

home, the grade of Newton Street up to its connection with Charlesview Street was increased so that its high point was at" that connection. "Once this was done, from an engineering standpoint, it was also necessary to bring the Newton Street extension toward Presentation Road in order to avoid excessive fill and excessive grade down" from the high land (see fn. 2) near Charlesview Street "into the former railroad property and also to provide for a more level connection with Presentation Road and Tilton Street, when and if they are extended to meet Newton Street as relocated."

The judge reached the following principal conclusions: (1) The DeLeuw firm (see fn. 2) acted in good faith and in accordance with sound engineering principles in relocating Newton Street and not in an attempt to assist Rivett. (2) The "[a]uthority did not take . . . [Village's] land for the purpose of sale or lease . . . to Rivett . . . [or] under the guise of public need with a design of depriving . . . [Village] of its property for the private need of Rivett."

1. The case was heard upon evidence consisting of numerous exhibits and voluminous oral testimony. The ultimate conclusions of fact of the trial judge are supported by his subsidiary findings and are not shown by the reported evidence to be plainly wrong in any material respect. See *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 407–408; *Lima* v. *Avery,* 343 Mass. 179, 180. The judge was justified by the evidence in finding that the relatively minor

however, that this part of Newton Street was raised in elevation so that "less space for slopes" was required; and that in 1960, when this area was vacant land, the "plans were laid out on the basis of no [retaining] walls" while the "1962 plans . . . [provided] bin-type retaining walls to avoid the taking of new buildings." Apparently these engineering adjustments permitted less of a cut into the hill and thus avoided damage to the nursing home (under construction in 1962). The trial judge's reference to moving Newton Street north in this area probably is to the change in the taking line. His discussion of the 1962 action east of Charlesview Street appears immaterial because the crucial factors in relocating Newton Street west of Charlesview Street were the elevations (see fn. 2) of the planned intersection of these streets (not changed between 1960 and 1962) and the former railroad land. The evidence (engineers' testimony and exhibits) about the topography of the area west of the intersection, by itself, justifies the significant finding in effect that, to obtain a proper grade from the intersection to the railroad land, it was good engineering to adopt the 1962 curved relocation of the extension.

1962 adjustments of the authority's original plans (which had been made as early as 1960) for relocating and extending Newton Street, were based upon sound engineering judgment rather than upon the desire to help Rivett.

The authority had ample power to make reasonable provision for access to the Faneuil Dump land which otherwise would have no direct access to highways after the turnpike construction. See *Luke* v. *Massachusetts Turnpike Authy.* 337 Mass. 304, 306, 309–310. When the dump area was merely vacant land used in connection with the railroad, it probably needed no greater possibility of access than was afforded by the private, unconstructed portion of Newton Street. After the dump land was acquired by the authority, was reduced in size by the turnpike and relocated rails, and became in part excess to the authority's needs, it was appropriate for the authority (see St. 1952, c. 354, §§ 5 [j], 7) to sell that excess land. Before doing so, it was reasonable for the authority to provide that substantial excess parcel with highway access over a substitute for the originally planned (but unsuitable) 1960 extension of Newton Street. See *Wright* v. *Mayor & City Council of Cambridge*, 238 Mass. 439, 440–441. It was within the power of the authority to take this action as a proper "by-product" of the public purpose involved in the construction of the turnpike extension. See the *Luke* case, 337 Mass. 304, 309. See also *Robie* v. *Massachusetts Turnpike Authy.* 347 Mass. 715, 725–729.

2. It is argued that the authority had no power under St. 1952, c. 354, § 7 (as amended by St. 1958, c. 384)[6] to take land in the name of the city unless it did so in order to relo-

---

[6] Statute 1952, c. 354, § 7 (as amended by St. 1958, c. 384), provides in part: "If the [a]uthority shall find it necessary to change the location of any portion of *any public highway*, it shall reconstruct the same at such location as the [a]uthority shall deem most favorable, with the approval of the state department of public works, and of substantially the same type and in as good condition as the original highway. The cost of such reconstruction and any damage incurred in changing the location of any such highway shall be ascertained and paid by the [a]uthority as a part of the cost of the turnpike. In exercising the power herein granted, the [a]uthority may take private property *in the name of a city or town* by exercise of the power of eminent domain . . ." (emphasis supplied).

cate a public way.   In a sense the whole relocation and extension of Newton Street may be viewed as a relocation of the former public way known as Newton Street east of Charlesview Street.   If this was the theory on which the authority made the taking, it should have obtained at some time the approval of the whole relocation by the State Department of Public Works, although nothing in § 7 makes such approval a condition precedent to the validity of the taking.[7]   If obtaining such approval has been omitted by inadvertence, it may be accomplished now.

The old "paper" Newton Street west of Charlesview Street, however, was a private way where it abutted on Village's land.   The authority may well have proceeded on the basis that it was only relocating a private way.   On this view of the facts, the department's approval was not required, for § 7 does not in express terms require such approval of the relocation of a private way.   The question remains, nevertheless, whether the taking in such a case could be made in the name of the city.

The authority had broad authority, under principles discussed above and in the *Luke* case, 337 Mass. 304, 309–310, to take property in its own name to provide access to the Faneuil Dump area.   See St. 1952, c. 354, § 5 (j), (k), (p). After such a taking, the authority, as a reasonable method of providing such access, could have transferred the westerly part of Newton Street to the city so that it could take action to lay it out as a public way (see St. 1906, c. 393, §§ 1, 2, as amended respectively through Sp. St. 1917, c. 318, and St. 1957, c. 20).   What the authority has in effect done is to do in one step, by a taking in the name of the city, what it could have done by a taking in its own name followed by other action.

Where the taking of the western end of the street was so closely related to the duly approved relocation of the for-

---

[7] We see no reason why the authority may not proceed reasonably with its eminent domain program, once it has obtained approval by the Department of Public Works of the general turnpike route, without settling the details of each appropriate relocation of local public ways, private ways, and rights of access.   See St. 1952, c. 354, § 1, as amended through St. 1955, c. 47; *Robie* v. *Massachusetts Turnpike Authy.* 347 Mass. 715, 719–721.

mer public portion of Newton Street, we hold that it was authorized by § 7. The creation of the extension of Newton Street as a public way may now be perfected either by obtaining the department's approval of the whole relocation or by city action to lay out the western end of the street as a public way.

*Decree affirmed.*

### The Mandamus Case.

In the mandamus case, the building commissioner admitted in his answer, among other things, (1) that Village prior to November 7, 1962 (the date of recording the takings), owned land in the vicinity of Newton Street, a substantial part of which was taken, and (2) that on November 9, 1962, Rivett applied for a building permit, which was issued to Rivett on December 28, 1962. The trial judge made findings which incorporated the findings in the equity case "by reference insofar as they may be relevant to . . . [the] petition for mandamus." He also found (1) that the authority owned (at the time of the findings, September 4, 1963) "the land upon which the building is being constructed by Rivett"; (2) that the time for performance under the purchase and sale agreement between Rivett and the authority "has passed and has not been extended"; (3) that "although the expressed intention of the parties is to carry out the . . . agreement . . . legal title . . . has not yet passed from the . . . [a]uthority; and (4) that "a substantial portion of [the] land upon which a manufacturing building is being built by Rivett . . . is in a [g]eneral [r]esidence [d]istrict (R40), under the . . . zoning regulations of . . . Boston and that the erection of a manufacturing building is prohibited in such a . . . [d]istrict." The judge went on to say, "I cannot find as a fact that title will pass out of the . . . [a]uthority. I cannot overlook the possibility that some condition (such as inability to pay for land) may crop up . . . and that therefore title may never pass from the . . . [a]uthority." He ruled that the property "owned by the . . . [a]uthority is not subject to the zoning regulation of . . . Boston."

Statute 1952, c. 354, § 3, created the authority. It provides that it "shall not be subject to the supervision and regulation of the department of public works or of any other department . . . or agency of the commonwealth except to the extent and in the manner provided in this act. The [a]uthority is hereby constituted a public instrumentality, and the exercise by the [a]uthority of the powers conferred by this act in the construction, operation and maintenance of the turnpike shall be deemed . . . to be the performance of an essential governmental function." The nature of the authority has been recently discussed. See *Massachusetts Turnpike Authy.* v. *Commonwealth,* 347 Mass. 524, 527–528; *Gardner* v. *Massachusetts Turnpike Authy.* 347 Mass. 552, 556, 562. The Boston zoning statute (see St. 1924, c. 488, § 22, as amended by St. 1928, c. 70) does not "apply to buildings or land belonging to and occupied by the . . . commonwealth." Although the property held by the authority is eventually to belong to the Commonwealth (see St. 1952, c. 354, § 17), it is not now owned by the Commonwealth. Nevertheless, the Legislature, by St. 1952, c. 354, as amended, made the authority sufficiently governmental in character so that the actual construction and operation of the turnpike, its essential "government function," and action reasonably related to that function, should not be prevented by a zoning statute applicable to one municipality or by a local zoning ordinance or by-law. See, e.g. c. 354, §§ 1, 5 (j).

That the turnpike operations of the authority are exempt from local zoning provisions does not mean that local zoning provisions are not applicable to land owned by the authority which has become wholly excess to the authority's essential turnpike function. We would be slow to conclude that the Legislature intended any such extraordinary result. See *Massachusetts Turnpike Authy.* v. *Commonwealth,* 347 Mass. 524, 527–528. Certainly, after the authority has conveyed in fee to private persons excess land formerly owned by it, such land does not remain exempt from zoning provisions because once owned by the authority.

Upon the facts found by the judge, it seems clear that the authority had no longer, for its turnpike operations, any remaining need whatsoever for, or interest in, the area which it had agreed to sell to Rivett.   After the contract of purchase and sale had been made, the building commissioner should properly have denied Rivett's application when it requested a permit to erect a building for its own private uses in violation of the zoning statute.   See *Smith* v. *Zoning Bd. of Appeals of Scituate,* 347 Mass. 755, 759. The trial judge, subject only to the considerations mentioned below, should have ordered that the commissioner enforce the zoning provisions.

Mandamus is in some degree a discretionary remedy. *Massachusetts Soc. of Graduate Physical Therapists, Inc.* v. *Board of Registration in Medicine,* 330 Mass. 601, 605–606. See *Nichols* v. *Dacey,* 329 Mass. 598, 600; *MacNeil* v. *Superior Court,* 339 Mass. 774.   The trial judge, in determining whether to grant immediate relief, was properly entitled to take into account the situation existing at the time of the trial.   The turnpike extension had not been completed. When completed, it might well turn out to affect materially the character of the neighborhood.   Most of the land north of the relocated Newton Street, near the Faneuil Dump area, was zoned for industrial use.   Only a small segment was in a residential zone.   The judge, as matter of discretion, might properly have delayed relief by mandamus for a reasonable time (see *Nichols* v. *Commissioners of Middlesex County,* 341 Mass. 13, 26–27, and analogy of *Chesarone* v. *Pinewood Builders, Inc.* 345 Mass. 236, 242–243) sufficient to permit application for a change in zoning or for a variance, or for other proper reasons in the interest of justice.[8]

---

[8] It was suggested at the arguments that there had been changes of the zoning of the portion of the dump area which were in a residential area at the time of the trial.   The record reveals nothing about this, and thus we do not now consider whether any such change, or a variance, would have been proper in view of the changes in the dump area caused by the turnpike extension, the moving of the railroad tracks, the relocation and extension of Newton Street, and related matters.   Any changes of zoning, of course, may be shown in the Superior Court in the further proceedings now ordered and may affect the judgment there to be entered.

Apart from such an exercise of discretion, relief should have been granted.

The order for judgment is reversed. The case is remanded to the Superior Court for further proceedings consistent with this opinion, which may include, among other things, (1) taking further evidence to determine whether the zoning and other aspects of the situation have changed or are likely to change in the near future, and (2) the exercise of reasonable discretion as to the time and terms of whatever relief may then appear to be appropriate.

*So ordered.*