COMMONWEALTH vs. CLIFFORD T. LEONARD.

Suffolk.    April 3, 1967. — June 7, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
& REARDON, JJ.

*Larceny.   False Pretences.   Practice, Criminal,* Comment by judge, Argu-
ment by prosecutor.   *Evidence,* Of larceny, Relevancy and materiality,
Of signature, Business record, Failure to produce witness.

Comments of the judge at a protracted trial of indictments suggesting dis-
approval of defence counsel's conduct of the case did not prejudicially
affect the defendant where the judge took reasonable steps to see that the
jury did not get an erroneous impression from his comments.   [641–
642]

At the trial of indictments for larcenies by false pretences of money of
the Massachusetts Turnpike Authority through invoices overstating work
done for it, testimony of a member of the authority that he would not
have approved its payments if he had had knowledge of the falsity of
the invoices was properly admitted on the issue of reliance [642–643];
and testimony of an accountant, based on each of various "assumptions"
of fact, as to the right amount that should have been paid by the
authority was properly admitted where it was left to the jury to decide
to what extent, if at all, the assumptions were true.   [643]

At the trial of indictments for larcenies by false pretences of money of the
Massachusetts Turnpike Authority through invoices overstating work
done for it, the secretary of the authority and custodian of its records
was properly permitted to testify to the signature of a former secretary
to the minutes of the authority's meetings at which requisitions for pay-
ment of the invoices were approved, and to read to the jury the former
secretary's attestation on each set of minutes that it was a "true record,"
even though the witness had no knowledge respecting the preparation or
contents of the minutes and the former secretary was available to testify.
[643–644]

Documents stating "work already done," prepared by the supervising engi-
neers of the Massachusetts Turnpike Authority, with invoices attached,
coming from the authority's "vendor's file" relating to a contracting
company the sole proprietor of which was indicted for larcenies by
false pretences of money of the authority through invoices overstating
the work done, were properly admitted at his trial as business records
under G. L. c. 233, § 78, as amended.   [644]

Conviction of the sole proprietor of a company having a contract with the
Massachusetts Turnpike Authority for the installation of road signs
upon indictments under G. L. c. 266, § 30, as amended by St. 1945,
c. 282, § 2, for larcenies by false pretences of money of the authority
was warranted by evidence that the company consistently submitted

invoices overstating the work done, that the defendant knew that the invoices were false and either submitted them or participated in submitting them, that he intended the authority to rely on them, and that submission of the false invoices set in motion procedures leading to the authority's reliance on the invoices and payment of them by it to the company by checks which were indorsed by the defendant for deposit to his account.  [644–646]

At the trial of indictments for larcenies by false pretences of money of the Massachusetts Turnpike Authority, a State instrumentality, through false invoices for work done, a statement in the prosecutor's argument of regret that direct evidence was not available to prove the defendant's responsibility for the invoices and that the Commonwealth had to rely on circumstantial evidence thereof, and a reference to "stealing from the State," were not prejudicial in view of timely and appropriate instructions by the judge to the jury.  [646–647]

At the trial of indictments for larcenies by false pretences of money of the Massachusetts Turnpike Authority through false invoices for work done, the judge properly refused to charge that the jury could consider the Commonwealth's failure to call as a witness a person available to both sides [647]; that the jury "should consider" that certain documents in evidence had not been steadily in the custody of the authority's custodian of records [647–648]; and that the jury "should" consider that a member of the supervising engineers for the authority' who had prepared certain documents admitted in evidence under G. L. c. 233, § 78, as amended, as prepared in the regular course of business, relied on other executive members of the engineers in preparing the documents.  [648]

INDICTMENTS found and returned on February 12, 1965.

The cases were tried in the Superior Court before *Forte, J.*

*Joseph J. Balliro* for the defendant.

*Howard W. Glaser & James B. Krasnoo,* Special Assistant Attorneys General, for the Commonwealth.

CUTTER, J.  Leonard was found guilty on five indictments, each charging him with larceny of over $100 of property from Massachusetts Turnpike Authority (Turnpike). He appealed and filed assignments of error.  There was evidence which would warrant the jury in finding the facts set out below.  The case is before us under G. L. c. 278, §§ 33A–33G, as amended.

Leonard did business as Colonial Contracting Company (Colonial), a sole proprietorship.  Colonial's office was in Leonard's house and its equipment was kept in a four car garage near that house.

Commonwealth *v.* Leonard.

On May 2, 1957, Colonial made a contract (no. 51–962) with Turnpike to install signs along roads leading to the turnpike. Colonial was to furnish a four man work crew (a foreman, a driver, and two laborers) at $30 an hour for each hour worked by the crew with specified additional compensation for weekday and weekend overtime. Colonial was also to furnish, for a compensation of $10 an hour, such "general supervision as may be required, subject . . . to the approval of" Highway Traffic Engineers, Inc. (Highway), supervising engineers for Turnpike.

The contract, by its terms to expire on June 15, 1957, was extended to March 31, 1958, but Turnpike and Colonial continued to treat the contract as in effect even after March 31, 1958. Colonial continued to submit invoices, and Turnpike continued to make payments, with reference to the contract.

The indictments dealt with sums paid for work done from June, 1958, to December, 1959, billed by invoices dated December 17 and 29, 1959, and paid February 25, April 14, June 23 and 30, and July 7, 1960. The aggregate amount of the payments to Colonial from Turnpike was about $147,000. Turnpike's checks to Colonial were indorsed by Leonard for deposit to Leonard's account. The Commonwealth contended that Leonard caused the invoices greatly to overstate the work done by Colonial especially with respect to (1) the number of men in the work crew, (2) the amount of overtime work, and (3) the extent of supervision.

(a) Colonial had a "basic" crew consisting of Carroll Ivers, its foreman, and two laborers, one of whom acted as driver. On about thirty working days a fourth man was added.[1] Ivers submitted to Leonard weekly reports of work done showing the names of workers and number of hours worked. There was overtime work on rare occasions during the entire period.

(b) Turnpike's chief engineer understood the term "general supervision" in the contract to include "a multitude of

---

[1] The testimony permitted the trier of the facts to conclude that there was no substantial overtime work and that a fourth man worked only a small part of the time.

duties'' in the field and in the office, but was unable to say what percentage of the time a ''general supervisor'' would be in the field. Such a supervisor's work would ''entail being sure that the work crews are . . . in the right location . . . doing the right kind of work,'' organizing the work, conferring with Highway's engineers, and checking the flow of materials. In his opinion, this work was to be done by someone not a member of the four man work crew. It was Highway's duty to get the necessary local permits to put up the signs, although Leonard did some of this. The members of the work crew reported to Leonard's house each morning before going to work and returned there each night. Leonard never accompanied Colonial's crew, but would appear at a job site about once to three times a month. Except for Leonard's visits, only Ivers supervised the work crew in behalf of Colonial while it was on the job.

William Donahue, employed by Highway, on its behalf checked the work of Colonial's crew. He made out ''daily progress reports.'' These he submitted weekly to Highway. Donahue always wrote down, as the number of men in Colonial's crew, one more than had actually been in the crew during a particular week. Donahue explained that he had been told to do this by Ivers the first day he had been assigned. Ivers told Donahue that the ''fourth'' (or the ''fifth'' man on those occasions when a four man crew worked) was Leonard. Donahue admitted that his reports did not state ''the truth'' concerning the number of men composing the crew.

Donahue's progress reports (which cover about 350 to 400 days billed) indicated only ''a couple of days'' of overtime. He was ''almost always'' with the Colonial crew, except on ''infrequent'' occasions when he was asked by Highway's traffic engineer ''to check on something'' else.

Colonial submitted invoices for work performed under ''contract # 51–962.'' These were typed on Colonial's letterhead but were not signed by Leonard or any other person. No direct evidence showed that Leonard prepared the invoices or directed another to do it for him. Ivers did

not prepare them. Leonard's wife did clerical work and typing for Colonial. The invoices each showed for a given period the information indicated in the margin.[2]

In the aggregate the invoices showed the following charges: 26,856 hours of regular time at $30 an hour; 4,055 hours of weekday[3] overtime; 2,033 hours of weekend overtime, and 26,281 hours of general supervision at $10 an hour.

The invoices (with four copies) were received by Highway. From these invoices Chester Heckman of Highway would prepare a document known as a "pay estimate" in accordance with Turnpike procedures. This was "a statement of work already done," rather than an estimate of future expenses. Heckman examined the invoices and made an office check of them for internal consistency with the supporting papers and, perhaps to some extent, to see whether they were in conformity with Donahue's progress reports. Heckman, however, had no independent source of information, like Donahue's reports on field work, concerning the "supervision" hours for which Colonial claimed payment. He relied largely upon the invoices in making out the "pay estimates."

The originals of the "pay estimates" and the attached invoices, and two sets of copies, would go to Turnpike and one set of copies would go to Howard, Needles, Tammen, and Bergendoff (Howard), Turnpike's engineering con-

---

[2] The work charges summarized on the invoices for a representative period were shown as follows:

"1958
| | | | | |
|---|---|---|---|---|
| 6/1–6/7 | 160 Hrs. | Reg. Rate as per attached schedule | $30.00 | $4,800.00 |
| 6/8–6/14 | 21 Hrs. | Overtime Rate per attached schedule | 36.50 | 766.50 |
| 6/15–6/21 | 5 Hrs. | Overtime Rate per attached schedule | 43.00 | 215.00 |
| 6/22–6/28 | 6 Days | Meals & Lodging per attached schedule | 48.00 | 288.00 |
| | 181 Hrs. | Supervision Time per attached schedule | 10.00 | 1,810.00' |

The invoices did not refer to a three or four or five man crew, but did mention the contract number and referred by the words "Reg. Rate" to the contract which provided in art. I (2) that each crew should consist of "one foreman, one chauffeur and two laborers" and in art. II, 1 (a), provided a rate "[f]or each work crew, including insurance, overhead and profit" of $30 an hour.

[3] The extra rate for weekday overtime was $6.50 an hour. For weekend overtime, it was $13 an hour. The invoices were supported by detailed monthly work reports listing by weeks the signs straightened, replaced, erected, or repaired. These, in some instances at least, were on Colonial's letterhead.

sultants.   Bernie Trice, an engineer with Howard, would check each pay estimate and Colonial invoice "in every way that . . . [he] could" and recommend it for approval to Turnpike.   The material available for checking the pay estimates consisted of the invoices and supporting material. No independent verification was made by Howard.   Trice relied upon the information in the pay estimates and invoices in submitting the estimates for approval.

Howard sent each pay estimate with its supporting papers to Turnpike.   Turnpike's chief engineer, Phillip Kitfield, would approve it, in reliance on Heckman's approval and on the papers sent to him, and would send the pay estimates to Turnpike's secretary-treasurer.   The latter would eventually include it as one item in "requisition certificates" presented to one of Turnpike's periodic meetings at which five such requisition certificates were approved.   Mr. John R. Kewer, an attorney and survivor of the three then members of the Turnpike board, testified that he would not have voted to approve the requisition and invoices if he had known of their falsity.   Five checks in payment were issued by Turnpike to Leonard.

1.   Leonard first contends that the trial judge improperly refused to order a mistrial on occasions, when the judge made:  (a) comments, among other matters, on what he obviously regarded as somewhat frivolous evidential objections by Leonard's counsel in the course of the presentation of the Commonwealth's case; and (b) a comment on an objection by Leonard's attorney to evidence offered by the Commonwealth concerning the typing of the Colonial invoices.   This last mentioned evidence had possible relevance on the issue whether Leonard had knowledge of the contents of the invoices.

Examination of the transcript shows that the trial judge not unreasonably was trying to keep a long trial (thirteen days) moving with expedition, and to avoid confusing the jury in a somewhat complicated case, although at times his comments suggested disapproval of defence counsel's and the Commonwealth's conduct of the case.   It would have

been much more appropriate for the judge to have made his comments out of the hearing of the jury. He took, however, reasonable steps to see that the jury did not get an erroneous impression from what he said. We conclude that Leonard was not prejudicially affected. See *Commonwealth* v. *McLaughlin, ante,* 218, 226–229.

2. The judge refused to strike Mr. Kewer's testimony.[4] By this testimony, the Commonwealth sought to prove a consecutive chain of reliance upon Colonial's invoices ending with Mr. Kewer and his associates, who acted upon the requisitions for payment of Colonial's invoices at Turnpike meetings.

The Commonwealth had introduced (through Turnpike's secretary-treasurer and custodian of its records) Turnpike's minutes of the meetings at which the requisitions had been approved, as records kept in the usual course of business. See G. L. c. 233, § 78 (as amended through St. 1954, c. 442, § 1); *Commonwealth* v. *Greenberg,* 339 Mass. 557, 578–579. An assignment of error (no. 5) based on the admission of these minutes in evidence has been waived. Because the minutes were independently in evidence, we need not decide whether the judge was warranted in regarding them as constituting a record of facts of which Mr. Kewer once had recollection, and copies of which he had approved as accurate when sent to him shortly after they were written. See *Fisher* v. *Swartz,* 333 Mass. 265, 267–268. Mr. Kewer's testimony was not offered to place the contents of the minutes before the jury.

Mr. Kewer's testimony (in effect that he would not have approved Turnpike's payments to Colonial if he had knowl-

---

[4] The assignment (no. 18) asserted that the judge "erred in denying . . . [Leonard's] motions to strike . . . [Mr. Kewer's] testimony . . . concerning the contents of the minutes of the meetings of . . . Turnpike" on the ground that Mr. Kewer had "demonstrated that he had no independent recollection of the minutes, that they did not refresh his recollection, and that they" were not "past recollection recorded." In the light of our discussion of this assignment, Leonard's motions to strike (and not merely to limit) all Mr. Kewer's "testimony . . . with reference to those materials contained in" the minutes was too broad in any event. See *Bryer* v. *P. S. Thorsen Co. of Mass.* 327 Mass. 684, 686–687.

edge of the falsity of supporting material) dealt with his own and Turnpike's established practice and "procedures in respect of paying vouchers." See *Commonwealth* v. *Iannello,* 344 Mass. 723, 736–737. See also *Commonwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 574. The testimony was admissible wholly apart from Turnpike's minutes.

3. One D'Amelio, an accountant, was permitted to testify about the amounts which should be deducted from payments to Colonial if each of various "assumptions"[5] was correct. It was left to the jury to decide to what extent, if at all, the assumptions were true and to what extent they would accept them. It was pointed out in the charge that the amount with which Turnpike might have been caused to part (by any false representations found to have been made) was immaterial so long as it was found by the jury in each case to be more than the $100 amount charged in the indictment. The trial judge explained to the jury that D'Amelio did no more than "what you can do in the jury room if you want to" do so. We view the accountant's testimony as essentially only arithmetical computations of the financial result of adopting any one or more of various views of the evidence. See *Commonwealth* v. *Greenberg,* 339 Mass. 557, 581–582. See also *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 279–280; *Commonwealth* v. *Boyle,* 346 Mass. 1, 3–4. Matters brought out on cross-examination of D'Amelio bore on the weight to be given to his testimony and on whether his assumptions were reasonable.

4. It was open to Stanley Britton, custodian of Turnpike's records of meetings, which had been admitted in evi-

---

[5] These assumptions were (1) that one man less worked each day than Donahue's reports showed as working; (2) that the man who did not work would have been paid $2 an hour (the lowest hourly sum paid by Colonial); (3) that there was no supervision; (4) that there was no overtime, except as shown on Donahue's reports; and (5) that a four man crew worked on days when Donahue made no report. Assumptions (2) and (5) were reasonable and may have been unduly favorable to Leonard. There was support for assumptions (1) and (4) in Donahue's testimony. Assumption (3) was apparently based on the evidence of Leonard's infrequent presence in the field.

dence under G. L. c. 233, § 78, as amended, to testify to the
signature of Lee J. Schnackenberg, at one time secretary-
treasurer of Turnpike. See *Commonwealth* v. *Meehan,*
170 Mass. 362, 363. See also *Commonwealth* v. *O'Rourke,*
311 Mass. 213, 219, 222–223. Schnackenberg had attested
each set of minutes as a "true record." Britton was prop-
erly allowed to read to the jury that attestation which was
a part of such minutes.

His lack of knowledge of the circumstances of the prepa-
ration of the record or of its contents was irrelevant. He
was not either "the entrant or maker" of the records, re-
ferred to in § 78, but merely the custodian. Schnacken-
berg's testimony concerning the records was as available to
Leonard as to the Commonwealth. The judge gave proper
instructions concerning the jury's function under § 78.

5. The "pay estimates" prepared by Heckman, with the
attached invoices, were properly admitted. There was evi-
dence that these came from Turnpike's "vendor's file" re-
lating to Colonial. The action of the judge in admitting
these records, if admitted solely as business records under
G. L. c. 233, § 78, as amended, "imported a finding that the
conditions of admissibility contained in . . . [§ 78] had
been satisfied." *Commonwealth* v. *Greenberg,* 339 Mass.
557, 579. See *Commonwealth* v. *Laudate,* 345 Mass. 169,
171–172.[6]

6. The indictments were returned under G. L. c. 266,
§ 30, as amended by St. 1945, c. 282, § 2 (see later amend-
ment by St. 1966, c. 153, § 1). This section provides that
"[w]hoever steals, or with intent to defraud obtains by a
false pretence . . . the property of another," shall be
guilty of larceny. This requires proof of (1) that a false

---

[6] The "pay estimates" and invoices, of course, were not offered to prove
the truth of their contents. Indeed, the Commonwealth contended that the
invoices were false. In major part, at least, these papers were offered to
prove the operative facts that certain representations had been made by
Colonial, that they had been presented to Turnpike, and what had been pre-
sented. See *Glassman* v. *Barron,* 277 Mass. 376, 382; *Rogers* v. *Superior
Court,* 46 Cal. 2d 3, 8; *People* v. *Henry,* 86 Cal. App. 2d 785, 788–789; Wig-
more, Evidence (3d ed.) § 1770, at pp. 185–188; McCormick, Evidence, § 228,
at pp. 463–464.

statement of fact has been made, (2) that it was known or believed by the defendant to be false, (3) that it was made with the intent that the person to whom it was made should rely upon its truth, (4) that such person did rely upon it as true and parted with personal property as a result of such reliance. *Commonwealth* v. *Kiernan,* 348 Mass. 29, 46. *Commonwealth* v. *Hamblen, ante,* 438, 442.

(a) There was evidence from which it could be found that Colonial by its invoices consistently charged (1) for work performed at the rate payable for a four man crew; (2) for substantial overtime; and (3) for ''supervision'' over a period of hours essentially equal to that of the time work crews were in the field during regular workdays. There was substantial evidence that in fact, most of the time, a three man and not a four man crew did Colonial's work; that almost no overtime was worked; and that there was no appreciable field supervision.

(b) Leonard owned Colonial. He signed the contract and thus knew its provisions. He conducted Colonial's business from his dwelling. He knew from Ivers' reports the number of men who worked. He was present when the crew left his house each morning and returned each evening. The invoices were on Colonial's letterheads. Mrs. Leonard was known to have done typing for him. Leonard picked up the checks for the invoices and deposited them to his own account. He made written request for sums (ten per cent) retained by Turnpike. These facts permitted finding his knowledge of the falsity of the invoices. It could be inferred that these were filed by, or with the participation of, Colonial's sole proprietor.

(c) The testimony of Heckman, Trice, Kitfield, and Mr. Kewer amply established reliance on the invoices. The presentation of false invoices could reasonably have been found to have set in motion a course of procedures by which the misrepresentations of the invoices (through an unbroken chain of causation) eventually influenced the conduct of the members of Turnpike's board, including Mr. Kewer. In addition to his testimony concerning reliance,

his testimony about Turnpike's established procedures in making payments, and that of the other witnesses, provided at least indirect proof of Mr. Kewer's and Turnpike's reliance on the invoices. See *Commonwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 574–575. See also *Commonwealth* v. *Iannello,* 344 Mass. 723, 735–737. The *Iannello* case, at p. 737, shows that, even if other causes also contributed to the payment of invoice overcharges, and even if the invoice misrepresentations only indirectly came to the board members' attention and caused their action, the proof of reliance was sufficient.

Leonard does not contend that there was not ample evidence (1) that the invoices were submitted with the intent that Turnpike rely on them, and (2) that Turnpike parted with its payments.

The judge correctly refused to direct verdicts for Leonard.

7. The trial judge declined to strike from the argument of the assistant attorney general two statements.

(a) One was that the "Commonwealth would have been glad to call . . . someone who was present when . . . Leonard typed those invoices or . . . when . . . Leonard told his wife to type those invoices." He was interrupted by defence counsel before he could complete his contention. The prosecutor's remark seems to us to be no more than an expression of regret (a) that direct evidence was not available to prove Leonard's responsibility for the invoices, and (b) that the Commonwealth would have to rely on the jury's willingness to infer Leonard's responsibility from circumstantial evidence. The judge, in any event, in effect so interpreted the remark before the jury at once. Later in his charge, he pointed out that statements of counsel are not evidence.

(b) The assistant attorney general also argued, "It is your [the jury's] decision that will set the standards of honesty in this state and it is your decision that will determine whether people can go on stealing from the state." Turnpike, of course, is a "public instrumentality." It is a "public corporation," and not "essentially a private com-

pany.'' It is performing a governmental function. *Luke* v. *Massachusetts Turnpike Authy.* 337 Mass. 304, 307–308. Its property will pass to the Commonwealth ''after it is paid for,'' as we noted in *Commonwealth* v. *Massachusetts Turnpike Authy.* 349 Mass. 1, 6–7. See *Village on the Hill, Inc.* v. *Massachusetts Turnpike Authy.* 348 Mass. 107, 118. Excessive or fraudulent demands upon Turnpike, if successful, will adversely affect the State. Turnpike, however, is not the State, even though it is a State instrumentality. The argument thus was not strictly accurate. As the matter was left, however, it was not prejudicial.

The judge at once paraphrased the argument, ''That if they [the jury] let the guilty go free, they will encourage other[s] to do the same thing,'' and went on to say that the jury, ''if they think he [Leonard] is not guilty, even if the whole world thinks he is guilty, it is their duty to find him not guilty.'' Taken with the judge's comments in his charge about statements of counsel, any minor inappropriate comment in the argument was reasonably put in the proper light. See *Commonwealth* v. *O'Toole,* 351 Mass. 627, 635–636.

8. The judge properly refused to charge that, in considering Turnpike's minutes in evidence, the jury could consider the Commonwealth's failure to call Schnackenberg, who had signed the minutes. No inference was properly to be drawn from either party's failure to call a witness available to both sides, especially since the records were admissible under G. L. c. 233, § 78, in any event. See *Commonwealth* v. *Monahan,* 349 Mass. 139, 170. See also *Commonwealth* v. *O'Rourke,* 311 Mass. 213, 222; *Commonwealth* v. *Morrissey,* 351 Mass. 505, 514–515.

There was similarly no prejudicial error in the denial of a requested instruction that the jury ''should consider,'' as going to the weight of the pay estimates and attached invoices, that they had not been steadily in the custody of Britton, Turnpike's custodian of records after July, 1965. There was no suggestion of any tampering with the records. In any event, the jury were under no obligation to

give weight to the interruption in custody, and the request as phrased could not have been given.   As noted above, the judge gave proper instructions concerning the jury's duty with respect to records admitted under G. L. c. 233, § 78, as amended.

The judge correctly refused to give a requested instruction that, in considering whether the "pay estimates" were prepared in the regular course of business, the jury "should take into consideration that . . . Heckman . . . in making up those . . . estimates relied on other executive members of . . . Highway."   If the basis of Heckman's reliance is relevant at all in considering whether the estimates were prepared in the regular course of business, Heckman's testimony indicates reliance largely on Colonial's supporting invoices.   The request thus contained a suggestion not supported by the evidence.

There was ample testimony, in any event, that Heckman had been charged by Highway with preparing these estimates.   If he did rely upon others to help him, that fact would have no bearing upon whether the statements met the requirements of c. 233, § 78.

*Judgments affirmed.*