COMMONWEALTH vs. DARRELL WALKER.

No. 06-P-471.

Suffolk. January 18, 2007. - May 24, 2007.

Present: DUFFLY, CYPHER, & GRAINGER, JJ.

*Evidence,* Admissions and confessions, Relevancy and materiality, Scientific test. *Practice, Criminal,* Admissions and confessions, Jury and jurors, Challenge to jurors, Argument by prosecutor. *Jury and Jurors.*

At a criminal trial, the judge did not err in admitting in evidence a statement that the defendant made to his mother after being arrested on a warrant, where equivocal statements by a criminal defendant are generally admissible in evidence, and there was no indication that the defendant was aware of the specific allegation to which the warrant referred when he made the statement; moreover, even if the statement should not have been admitted, the evidence had a limited effect on the jury, given the other, overwhelming evidence of guilt. [140-141]

The judge at a criminal trial did not err in failing to inquire of the prosecutor to determine whether the prosecutor had a bona fide reason for certain peremptory challenges, where the record supported an implicit finding on the judge's part of no pattern of improper challenges. [142-144]

At the trial of indictments charging rape, the judge did not err in permitting a police crime laboratory criminalist who had not performed tests on a rape kit to testify regarding the presence of semen found on swabs in the rape kit, where the criminalist was competent to testify about the results of the laboratory tests, which were objective laboratory facts that did not raise hearsay issues, and where any error in the admission of her testimony was not prejudicial, as the evidence was cumulative [144-145]; moreover, the defendant was not entitled to a missing witness instruction regarding the crime laboratory employee who had performed the tests, where that witness was as available to the defendant as to the Commonwealth [145].

The prosecutor at a criminal trial committed no impropriety in closing argument, but rather properly marshaled the evidence, addressed issues of credibility, and fairly urged verdicts of guilt. [145-146]

INDICTMENTS found and returned in the Superior Court Department on December 5, 2002.

The cases were tried before *Elizabeth B. Donovan,* J.

*Edward J. DeAngelo* for the defendant.

*Amanda Lovell,* Assistant District Attorney, for the Commonwealth.

CYPHER, J. A grand jury indicted the defendant, Darrell Walker, on two separate charges of rape, vaginal and oral, G. L. c. 265, § 22(b); unarmed robbery, G. L. c. 265, § 19; assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A; and assault and battery, G. L. c. 265, § 13A. A jury found the defendant guilty of vaginal rape, assault and battery by means of a dangerous weapon, and assault and battery and acquitted him of the remaining charges. The defendant appeals from the convictions.

*Factual background.* A jury could have found the following facts.[1] At around 10:30 P.M. on January 26, 2001, Susan Brown[2] left her sister's apartment in the South Boston section of Boston to walk to a friend's home to get a cigarette. Three men she did not recognize walked toward her. One asked if she had a cigarette; she said she did not smoke, even though she actually did smoke, but just "wanted to go on [her] way." One of the men asked her if she wanted to smoke some marijuana, and she agreed. They walked to a nearby basement stairwell. Brown and two of the men went down the stairs while the other man stayed at the top. One of the men rolled the marijuana cigarette, and they introduced themselves to Brown.

The man at the top of the stairs, later identified through deoxyribonucleic acid (DNA) evidence as the defendant, yelled to Brown, "[C]ome here," and she complied. The defendant led Brown away from the other men. He told her that his name was Dennis, that he was from a neighborhood in another section of Boston, and that his aunt had an apartment in the area. They crossed the street. He opened a door and took her into a hallway. Brown began to feel nervous.

The defendant told Brown to be quiet. In an aggressive, angry voice he instructed her to "suck his dick." He grabbed her head and "pulled it down to his penis and forced his penis in [her] mouth." After some time, he told her to stop. Brown, frightened, asked him what he was going to do. He did not answer her. She went out of the door to the building, but the defendant punched her in the ear from behind. She was dazed and could not hear anything for a minute.

The defendant grabbed Brown's arm and pulled her back to

---

[1]We reserve additional facts for discussion where relevant.

[2]A pseudonym.

the door, but they remained outside. He turned her to face the door and stood behind her. He pulled her pants down and stuck his penis in her vagina. It hurt.

When the defendant finished, he turned Brown around and told her to button her pants. He demanded forty dollars. She said she did not have it and attempted to show him that her pockets were empty. He punched her on the top of head, hard enough to daze her, punched her five or six more times, and then slammed her up against the wall, knocking her to the ground. He kicked her and stomped on her head. He was wearing work boots. Brown tried to block her face with her arms. He kicked her three or four times. She closed her eyes, feigning unconsciousness so that he would stop the attack. The defendant grabbed her purse and ran away.

Brown waited until she could no longer hear the defendant's footsteps. She ran from the area, covered with blood. She asked a man getting into a truck to take her to the hospital, but he refused. She ran to a store and asked the owner and employees to call an ambulance.

An ambulance took Brown to the Boston Medical Center, where a SANE[3] nurse took swabs from Brown's mouth, vagina, and perineal area, and samples of her hair and blood. The nurse also photographed Brown's injuries. The nurse then put the samples in the rape kit and sealed the kit with police tape. Brown received medication and several injections to prevent pregnancy and sexually transmitted diseases. One of the injections was very painful.

Both of Brown's ears were injured, and one of her eardrums was perforated. She had a cut on the back of her head with a raised hematoma and a concussion. Her neck was sore, and her hands and arms up to her elbows were black and blue and swollen. Her face was swollen and cut. She also had tearing lacerations on the lowermost section of her vagina.

Brown was legally blind and needed to focus on whatever she was trying to see before she could see it accurately. Nevertheless, she was able to describe her attacker as a light skinned African-American, about twenty years old, six feet tall and of medium

---

[3]Sexual assault nurse examiner.

build, and around 180 pounds. The defendant was five feet, eleven inches tall, weighed 187 pounds, and was twenty years old several months after the attack. Brown also identified a pair of boots seized from the defendant as the same color and having the same type of laces and sole as those worn by the perpetrator. She did not identify the defendant at trial.

*Forensic evidence.* Christine Stevens, a senior criminalist at the Boston police crime laboratory, testified that the crime laboratory received the rape kit on February 5, 2001. Of the twenty-two swabs in the kit, ten had semen on them. A single vaginal swab containing semen was sent for DNA testing in the DNA section of the laboratory.

Julie Lynch, a senior criminalist from the DNA section of the Boston police department crime laboratory, testified about the DNA testing that was done on the vaginal swab. In the particular mixture that was tested, 99.99 percent of Caucasians, southeastern Hispanics, and African-Americans could be excluded as "possible contributors"; the defendant could not be excluded.

*Discussion.* 1. *The defendant's statement to his mother.* The defendant was arrested on a warrant for rape at the Middleborough police station on May 23, 2002. His mother accompanied him to the police station. The defendant claims that a statement he made when he was arrested should not have been admitted because his statement referred to a different incident. Specifically, upon hearing that her son was being arrested for rape, the defendant's mother asked him what was going on. The defendant replied, "You know how girls are when you break up with them." The defendant argues that he thought that the warrant pursuant to which he was being arrested did not pertain to the victim here; he claims that the statement was unrelated to the case.[4]

The defendant filed a motion in limine to prohibit the in-

---

[4]One year after the alleged attack on Susan Brown, the defendant was accused of rape in the Dorchester section of Boston on March 30, 2002, involving a woman who had gone to high school with the defendant. The defendant argues that the record establishes that the warrant that was lodged at the Middleborough police station on May 23, 2002, was for the 2002 Dorchester case, not for the 2001 South Boston case that is the subject of this appeal. When this issue was first raised during consideration of the motion in limine, the prosecutor represented to the court that the warrant was for both cases.

troduction of the statement and objected to its introduction at trial. At trial, defense counsel requested a voir dire of the Middleborough police officer who overheard the statement, to which the judge agreed. Detective Robert Lake of the Middleborough police department testified in the voir dire that on May 23, 2002, the defendant and his mother walked into the police station and the detective told him that there was a warrant for his arrest on the charge of rape. The detective neither knew nor told the defendant about any details of the underlying charge, including when or where the incident occurred, that the warrant was issued out of Boston, or who the complainant was. The judge denied the motion in limine. The judge indicated that the relevant inquiry was whether the defendant knew which rape underlay the warrant and that there was no evidence that he did. The judge's decision is overturned on appeal only for palpable error. *Commonwealth* v. *Silva*, 401 Mass. 318, 322 (1987).

The judge did not err in allowing the defendant's statement in evidence. In the case of *Commonwealth* v. *Kruah*, 47 Mass. App. Ct. 341, 344 (1999), this court noted that "[e]quivocal statements by a criminal defendant are generally admitted in evidence." *Ibid.*, quoting from *Commonwealth* v. *Estep*, 38 Mass. App. Ct. 502, 507 n.1 (1995). Additionally, there was no error because if the warrant pertained to a set of different alleged facts, there was no indication that the defendant was aware of the specific allegation to which the warrant referred when he made the statement.

Moreover, even if the statement should not have been admitted, in light of the overwhelming evidence of guilt in the form of DNA evidence,[5] we can say with fair assurance that the evidence had a limited effect on the jury. See *Commonwealth* v. *Best*, 50 Mass. App. Ct. 722, 725-726 (2001). In the context of the case, it is likely that, as defense counsel argued in closing, the jury perceived that the statement "ha[d] nothing at all to do with this. It has to do with a young man and his mother and [his] trying to make her feel better as he's being arrested for something that there is no proof that he did." There was no error.

---

[5] It appears that the jury relied heavily on the DNA evidence. The defendant was convicted on the charge of vaginal rape, for which there was DNA evidence, and acquitted on the charge of oral rape, for which there was no DNA evidence.

2. *Peremptory challenges.* The defendant claims that the prosecutor improperly struck four prospective jurors because they were African-American or Hispanic and that the judge erroneously did not inquire of the prosecutor to determine whether the prosecutor had a bona fide reason for the challenges. The judge did not inquire of the prosecutor, but the prosecutor volunteered her reasons for the first three challenges.

"Peremptory challenges are presumed to be proper, but that presumption may be rebutted on a showing that '(1) there is a pattern of excluding members of a discrete group and (2) it is likely that individuals are being excluded solely on the basis of their membership' in that group." *Commonwealth* v. *Maldonado,* 439 Mass. 460, 463 (2003), quoting from *Commonwealth* v. *Garrey,* 436 Mass. 422, 428 (2002). If the judge finds that a prima facie showing of an improper use of peremptory challenges has been made, *Commonwealth* v. *Maldonado, supra* at 463, "the burden shifts to the party exercising the challenge to provide a 'group-neutral' explanation for it." *Ibid.* "Implicit in the judge's response [declining to require the prosecutor to supply an explanation for her challenges] is a finding that a prima facie showing of impropriety had not been made." *Commonwealth* v. *Suarez,* 59 Mass. App. Ct. 111, 114 (2003).

We "will not overturn the judge's ruling if there is a sound basis in the record for her ruling." *Ibid.* The "appellate court must be able to discern from the record whether that preliminary finding has been made, one way or the other." *Commonwealth* v. *Maldonado, supra* at 463 n.5.

An implicit finding of no pattern of improper challenges is supported in the record. At the time the defendant objected, it appears that there were two African-Americans or one African-American and two Hispanics seated on the jury. It is relevant to the determination of a pattern of conduct of challenging jurors based on their membership in a discrete group that the attorney has not challenged the seating of other members of that group. *Commonwealth* v. *Suarez, supra* at 114-115. "[T]he challenge of [the jurors in question] fell well short of purging the jury of its only member of an *identifiable group.*" *Commonwealth* v. *Vega,* 54 Mass. App. Ct. 249, 251 (2002). It is also noteworthy that defense counsel challenged a juror who had a Hispanic

surname after the judge declined to inquire further of her. See *id.* at 252 (defendant's complaint that prosecutor was removing jurors based on Hispanic ethnicity was disingenuous because he later struck potential juror with Hispanic surname).

The prosecutor volunteered that each of the challenged jurors had said that they had family members who had been arrested, but they had not disclosed this in their questionnaires and did not change their answers when given the opportunity. See *Commonwealth* v. *Pasteur*, 66 Mass. App. Ct. 812, 824 (2006) (prosecutor's challenge to juror based on juror's failure to reveal criminal history was group-neutral).

In any event, the record makes clear that all of the potential jurors whom the prosecutor challenged — to which challenges the defendant objected — had themselves been, or had had family members who had been, prosecuted for crimes by the Suffolk County district attorney's office.[6] In such circumstances, these potential jurors could harbor resentment against the office, and the prosecutor is entitled to strike them. The judge was well within her discretion to find no pattern in these strikes.

The defendant argues that other jurors with criminal records were seated and that of the four potential jurors who were not African-American, but who had family members who had been prosecuted, the prosecutor struck only one. Of the four, one had

---

[6]The prosecutor had filed a motion before the trial for judicial inquiry into the venire's criminal background. Specifically, the prospective jurors whom the prosecutor challenged, to whom the defendant objected, included one who stated that she had had "a couple of family members" prosecuted "recently, like a year ago," by the Suffolk County district attorney's office. Another had had "cousins" prosecuted by the Suffolk County district attorney's office for drugs, which she described as "nothing major." According to the defendant, both of these jurors were African-American. The Commonwealth challenged another juror who had not disclosed on her juror form that, eight years before, as a fifteen year old, she had been arrested and prosecuted in Suffolk County for having fought with a girl. Defense counsel renewed his objection, stating that the prosecutor had challenged three jurors, a black male, a black female, and a Hispanic female. The judge responded, "I'm not even going to inquire at this point, on the representations that have been made to me by the potential jurors." The last challenged juror about whom the defendant complains had a cousin who had been convicted by the prosecutor's office for murder and was serving a life sentence. Defense counsel objected to the prosecutor's use of a peremptory challenge for this juror, stating that the juror was a black female. The judge stated, "I know, and her responses are on the record, and I'm still not going to inquire."

a Hispanic surname. See *Commonwealth* v. *Carleton*, 418 Mass. 773, 775 (1994) (it is permissible to draw inference of ethnicity from juror's surname). The Commonwealth notes that although the potential juror had a cousin who had been prosecuted by the Suffolk County district attorney's office, she also had a child who was a victim in a case prosecuted by the office. The other three jurors who had some contact with a prosecution had that contact in other jurisdictions. In these circumstances the defendant did not meet his burden of establishing a prima facie case that the prosecutor made improper peremptory challenges.

3. *Admission of evidence regarding the rape kit.* The defendant argues that Boston police crime laboratory criminalist Christine Stevens should not have been permitted to testify "that semen was found on swabs in the rape kit" because she did not perform the tests herself and therefore her testimony was hearsay and violated the defendant's rights under the Sixth Amendment to the United States Constitution.

The defendant claims that trial counsel objected to Stevens's testimony. However, during a sidebar conference, when a report authored by Julie Lynch and Joseph Varlaro was mentioned, the judge explained that "she" (Lynch) was going to testify and that Stevens was only testifying regarding the number on the kit. Defense counsel responded, "That's fair." There were no further objections to Stevens's testifying. We do not construe this exchange among counsel and the judge to constitute an ongoing objection to Stevens's testimony.

The testimony was admissible. Stevens's competence to testify about the results of the laboratory tests is not in dispute. The results were objective laboratory facts and did not raise hearsay issues. See *Commonwealth* v. *Leinbach*, 29 Mass. App. Ct. 943, 944 (1990).[7]

Even if there had been error in admitting the testimony, the evidence was cumulative. Lynch testified that she personally found sperm on the swab that she tested; therefore, Stevens's testimony that several swabs contained semen was cumulative.

---

[7]The Commonwealth now urges that Christine Stevens's *testimony* was admissible under the business records exception statute, G. L. c. 233, § 78. This basis for its introduction was not argued at trial, and there appears to have been no "record" that was offered in evidence.

Aside from the testimony about the presence of semen on the swabs, the only other material evidence to which Stevens testified was that the rape kit had been received by the laboratory. As Lynch subsequently testified that the number on the material from the rape kit that she tested matched the number on the rape kit that the SANE nurse used to collect evidence from Brown, and that she found no alleles that could not have come from either the defendant or Brown, there appears to be no question that the rape kit Lynch tested was the rape kit that the SANE nurse collected. Essentially, all of Stevens's testimony was cumulative of testimony about which the defendant makes no claim of impropriety, so that even if it had been improperly admitted, it could not possibly have prejudiced him.

The defendant also argues that he was entitled to a missing witness instruction because crime laboratory employee Joseph Varlaro, who had performed some tests, did not testify as he had left the crime laboratory and moved to California. We have long permitted substitution of laboratory personnel in appropriate circumstances. See *Commonwealth* v. *Leinbach*, 29 Mass. App. Ct. at 944 (senior chemist testified in place of chemist who had been suspended). Compare *Commonwealth* v. *Sparks*, 433 Mass. 654, 660 (2001) (proper to permit director of forensic laboratory to testify based on independent review of data). In any event, the defendant was not entitled to such an instruction, as Varlaro was as available to the defendant as he was to the Commonwealth. *Commonwealth* v. *Leonard*, 352 Mass. 636, 644 (1967) (maker of record who did not testify was as available to defendant as to Commonwealth). See *Commonwealth* v. *Hoilett*, 430 Mass. 369, 376 (1999). There was no error in the refusal to give the instruction.

4. *Closing argument.* The defendant argues that the prosecutor's closing argument "improperly played on the jury's sympathies, appealed to [their] sense of duty, and denigrated the role of defense counsel." Specifically, defense counsel objected to the prosecutor's argument that defense counsel was trying to "distract" the jury; to the prosecutor's reference to Brown being "a girl" and thereby garnering sympathy for her; to the prosecutor's statement that testifying in a public court room was "horrific"; and to the prosecutor's drawing the jurors' attention

to Brown's and her sister's demeanor while testifying, which counsel described as crying, as an attempt to garner sympathy. The judge implicitly overruled all of the objections.

We have reviewed the alleged improprieties in the context of the entire trial and closing argument, under the backdrop of the appropriate standard of review, and we conclude that there was no error. The prosecutor properly marshaled the evidence, addressed issues of credibility, and fairly urged verdicts of guilt.

*Judgments affirmed.*